J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Chen Wang Cole*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHEN WANG COLE, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br>   vs.<br><br>BABY NEEDS INC., a North Carolina corporation; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR (1) COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; (2) UNJUST ENRICHMENT; (3) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (4) INTRUSION UPON SECLUSION** |

## **INTRODUCTION**

1.     Plaintiff, on her behalf and on behalf of a class of similarly situated persons brings this action against Defendant Baby Needs Inc. ("Defendant" or "Baby Needs"), a North Carolina corporation, a leading online provider of premium baby products including apparel, toys and blankets.

2.     Defendant has installed and deployed data broker software on its website – https://elegantbaby.com/ (the "Website") – to secretly collect data about visitors to the Website, their devices, locations and views of webpages to identify who they are, target them with unwanted marketing and track their internet browsing on an ongoing basis.  The data broker software then compiles this data and correlates it with extensive external records it already has about most Californians in order to learn the identity of the Website visitor.  In addition, Defendant and the Website utilize software owned by the social media platform-operating entities X Corp. (formerly Twitter) that operates in a substantially similar manner.  Both Defendant and the third-party data collectors involved benefit commercially and financially from this surveillance. The surveillance and collected visitor data are used to target Website visitors for specific marketing, among other things.

3.     What's worse than the foregoing is that Defendant made the false promise to Plaintiff and to all visitors to the Website from California that it would honor their choice to decline the use of "cookies and other technologies" on the Website that are used by third parties such as the data brokers and X Corp.  The promise was false, the Website subjected Plaintiff – and other visitors who made that express choice to decline – to the "cookies and other technologies."

4.     The "cookies and other technologies" function by transmitting information relating to Website visitors to third parties such as the data brokers and X Corp.  The type of information transmitted is routinely used to identify visitors and track their internet browsing. Further, the deployment of *the data broker software* on the Website facilitates the selling of visitors' data to third parties.

CLASS ACTION COMPLAINT

5.   The data broker software compiles the collected data and correlates it with extensive external records it already has about most Californians, in order to learn the identity of Website visitors. The X. Corp. code operates in a substantially similar manner.

6.   Both Defendant and the third-party recipients of the data of Plaintiff and other California visitors benefit commercially and financially from this activity. This is because collected (and transmitted) visitor data – as well as the identification of specific visitors the collected data makes possible – target Website visitors for specific marketing.  Data brokers, such as those named here, also sell personal information about individuals they receive from website operating customers or partners.

7.   Defendant's installation and use of data broker software, and code supplied by X Corp., without obtaining consent or authorization therefore violated (a) California Penal Code § 638.51, California's Trap and Trace Law and (b) duties Defendant owed to them under the common law.  Further, Defendant's use of such code *after Plaintiff and visitors encountered a consent banner on the Website, and using the banner to decline expressly being subjected to certain "cookies and other technologies" operating on the Website* represents common law fraud, deceit and/or misrepresentation by Defendant.

## JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.  Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

9.   Defendant Baby Needs is a North Carolina corporation that is headquartered in North Carolina.  This Court has specific personal jurisdiction over

CLASS ACTION COMPLAINT

3

Defendant with respect to all claims asserted in this action.

10.    Through the Website, Defendant sells products to consumers in California, known to the Website as being located in California at the time they visit the Website. Moreover, Defendant's products are sold at brick-and-mortar locations in California through retailer agreements with such department stores as Nordstrom, Bloomingdale's and Saks Fifth Avenue.  There are 26 Nordstrom department stores located in California, and 11 Bloomingdale's.

11.    Defendant derives substantial revenue from California-based transactions through its operation of the Website.  Defendant deliberately reaches out to consumers browsing the internet from locations in California, depositing code on their devices and availing itself of opportunities to conduct business in California through the Website.  Defendant intended and understood that such consumers would suffer injury in California.

12.    Defendant's Privacy Policy, which appears on the Website on the webpage https://elegantbaby.com/policies/privacy-policy (last viewed 3/25/2026), references Defendant's purported compliance with California privacy law with its Website – implicitly addressing consumers protected by California privacy law.  The Privacy Policy does not mention the law of any other state.

13.    The data brokers whose code Defendant installed on its Website, and the deployment of which forms the basis of Plaintiff's claims (and those of the putative class), NextRoll, Inc. ("NextRoll"), LiveRamp Holdings, Inc. ("LiveRamp") and PubMatic, Inc. ("PubMatic"), are each headquartered in California.  The principal offices of NextRoll and LiveRamp are located in San Francisco. PubMatic's principal offices are located in Redwood City. On information and belief, the data transmissions to these 3 data brokers at the heart of the claims asserted in this action are received by the data brokers through infrastructure located in California they own or lease.

14.    On information and belief, Defendant's partnership with NextRoll is

CLASS ACTION COMPLAINT

4

governed by Terms of Service that tie this action to California. Those terms include that California law governs the agreement formed between Defendant and NextRoll through the Terms of Service. Further, the Terms of Service provide that "any judicial proceeding to resolve claims relating to this Agreement or the Services will be brought in the federal or state courts located in San Francisco County, California" subject to certain arbitration provisions.

15.    On information and belief, Defendant has entered into a Publisher Master Services Agreement with PubMatic (the "MSA").  The MSA contains a provision that states: This Agreement shall be construed and interpreted under the laws of the State of California."  The same provision in the MSA provides that "the parties [to the MSA] hereby submit to the exclusive jurisdiction of, and waive any venue objections against the state and federal courts located in Santa Clara County, California in any dispute arising under or in connection with this Agreement."

16.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

**PARTIES**

17.    Plaintiff  Chen Wang Cole ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California.  Plaintiff maintains reasonable expectations of privacy when browsing websites.

18.    Defendant is a North Carolina corporation that sells apparel and toys for infants through the Website, and also through retailers across the United States.

19.    Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining

CLASS ACTION COMPLAINT

Defendant's surveillance activities. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

20. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

21. Defendant is the proprietor of the Website.

22. The Website, like most other websites, due to code or software programs running on the Website, determines the state, and sometimes the city, in which its visitors are located – between the time a visitor requests to go to the Website (through clicking on a link or typing the Website's address into the browser address bar), and the time the Website loads on her screen. This location gathering occurs separately and apart from the Data Broker software and the X Corp. code running on the Website that forms the basis of Plaintiff's claims. Therefore, Defendant has at the very least constructive knowledge that the data broker and X Corp. software on the Website that is the subject of this action operated on Plaintiff, and visitors to the Website from California similarly situated, ***while they were located in California***. Defendant had such knowledge during the time the violations alleged herein occurred.

23. On February 27, 2026, Plaintiff visited the Website. When she did, data that reasonably likely identified her were transmitted to at least four (4) third parties who used and profited from that data, along with Defendant: NextRoll, LiveRamp, PubMatic and X Corp. This occurred through the operation of software and code on the Website.

**Defendant Shares Visitors' Data With At Least 3 Data Brokers and 1 Social Media Company**

24.    Defendant has partnered with at least three (3) registered California data brokers, NextRoll, LiveRamp and PubMatic, in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to NextRoll, LiveRamp and PubMatic on the Website.

25.    Defendant has also partnered with X Corp. in order to identify and track visitors to its Website for Defendant's benefit, as well as that of X Corp., and possibly other social media-platform running companies, by installing code proprietary to these companies.

26.    The NextRoll, LiveRamp and PubMatic code deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed.  The process initiated by the NextRoll, LiveRamp and PubMatic code identifies visitors through "browser fingerprinting."  Fingerprinting allows data brokers like NextRoll, LiveRamp and PubMatic to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.  The X Corp. code deployed on the Website work in similar ways, as described *infra*.

**Browser Fingerprinting**

27.    Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings is transmitted to third parties such as NextRoll, LiveRamp, PubMatic and X Corp.?  One would assume the sharing of such seemingly non-descript data cannot impact a visitor's life or experience.  This assumption is simply incorrect.

CLASS ACTION COMPLAINT

7

28.    The fact is that when you visit a website, *and before you get to weigh in on whether you should be targeted with ads or identified*, hundreds of non-personal data points tell those data brokers and social media companies who you are, or at the very least start this process.  (These data points are *usually* accompanied by information such as the webpage you arrived from.)

29.    Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

30.    To be clear, *website operators* require some of the data points at issue to render the contents of a page on a website on their visitors' devices.  For example, a webpage will only appear properly to a visitor with information about a visitor's device characteristics and configurations, including screen size.  What is being discussed here – and what is at issue in this action – is such data being provided to *third parties not involved in operation of a website itself, or the rendering of a website's contents on the screens of visitors.* The data brokers and social media

CLASS ACTION COMPLAINT

8

companies do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

31. As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, **when put together, is unique enough that it could identify an individual**. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[1]

32. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a website.[2]

---

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 2/22/2026).

[2] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

CLASS ACTION COMPLAINT

9

33. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[3] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[4]

### The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers

34. Collection of visitor data by entities such as NextRoll, LiveRamp, PubMatic and X Corp. – including collection by these entities of unique identifiers that the NextRoll, LiveRamp, PubMatic and X Corp. code assigns to visitors to the websites of advertising companies like Defendant – enables ongoing tracking of website visitors as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of NextRoll, LiveRamp, PubMatic and X Corp., and similar organizations.

---

[3] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).

[4] *Id.*

35.   As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

### Registered California Data Brokers

36.   Registered California data brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data

about individuals and organizations. Data brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

37. Registered California data brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

38. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

39. Data brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a data broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:

> We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation.[5]

---

[5] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users" (Gizmodo.com March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 2/22/2026).

CLASS ACTION COMPLAINT
12

40.    Given the amount of data available by way of the data brokers' practices, a company like Defendant has an incentive to partner with data brokers so that it can learn the identity of visitors to its website for use in connection with the company's marketing efforts.

41.    Here, Defendant partnered with three (3) California registered data brokers, NextRoll, LiveRamp and PubMatic (the "Data Brokers") and with X Corp., by installing NextRoll, LiveRamp and PubMatic code (the "Data Broker Code") and X Corp. code onto the Website.  Defendant allows NextRoll, LiveRamp, PubMatic and X Corp., and other data brokers and social media companies, to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public.

### NextRoll Code

42.    NextRoll, Inc. ("NextRoll") is a marketing technology company specializing in retargeting and targeted advertising services.  NextRoll appears on the California Data Broker Registry, indicating it trades in the personal data it collects (for example, by assembling audience segments or profiles that are used in advertising). NextRoll's services reach across a vast network of websites and advertising exchanges, and the company openly touts its ability to recognize users across different sites and even across devices for marketing purposes.

43.    The NextRoll code on Defendant's Website is a snippet of JavaScript that website owners embed in their site's HTML, typically in the header. Once installed, a feature of the NextRoll Code called the "AdRoll pixel" tracks essentially every action a visitor takes on the site. NextRoll's own help center describes the AdRoll Pixel as code that "tracks everything your visitors are doing on your site" The NextRoll code functions as follows:

44.    First, when a user loads a page, the NextRoll code executes and sends an HTTP request to NextRoll's servers, including various pieces of information about the visitor's session. According to NextRoll's documentation, the NextRoll

CLASS ACTION COMPLAINT

13

code collects HTTP header data – this includes the user's IP address, their browser user agent (which reveals browser version and operating system), the referrer URL (i.e. where they came from), and the current page URL. In addition, the NextRoll code captures site-specific data: it attaches an "advertisable ID" and "pixel ID" to identify the website/ad account in NextRoll's system (so NextRoll knows which client's site the data came from). It then records user actions on the page (what NextRoll calls "Site Activity") such as page views, clicks on certain elements, form submissions, items added to cart, and other conversion events.

45.    Second, NextRoll then assigns each browser a "User identifier" the first time the AdRoll pixel sees that browser.  This is a persistent cookie stored in the user's browser (often named something like "adroll" or "nextroll" cookie) that allows NextRoll to recognize the same user on subsequent visits or on other websites that also have AdRoll/NextRoll tracking.  The NextRoll ID cookie is "persistent" because it enables the tracking of the visitor beyond her visit to the website when the cookie is first installed.  If another unrelated website also uses the NextRoll code, that same cookie ID will be recognized and the user's visit to that unrelated website will be captured as well, and associated with their existing profile.

46.    Third, NextRoll  platform performs "cookie matching," meaning it will compare its own user identifier with identifiers used by other ad platforms in order to broaden the reach of tracking and ad delivery.  For example, if NextRoll's pixel technology finds a user, NextRoll can later synchronize that user's ID with, for example, a Facebook or Google cookie, to continue tracking the user's activity across the internet, storing all of the information collected in a discrete user profile.

47.    Plaintiff was subjected to the NextRoll code as described *supra* starting when she requested that the Website load on her device on February 27, 2026.

**LiveRamp Code**

48.    LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LiveRamp code on Defendant's Website

tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID." The LiveRamp code functions as follows:

49.    First, when the LiveRamp code loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

50.    Second, the data obtained by the LiveRamp code is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline. This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

51.    Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number). LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices. The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

52.    Identification of website visitors through the LiveRamp code happens in "real-time," allowing the websites of LiveRamp's customers to "access people-based data immediately at the time of impression." It also works across devices. In other words, the LiveRamp code can inform websites using it that the same account or person has accessed the website from different devices. As LiveRamp explains, "[w]ith impressions matched to a persistent people-based ID, data are stitched across devices and not lost over time with new cookies or phones."

53.    Plaintiff was subjected to the LiveRamp code as described *supra* starting when she requested that the Website load on her device on February 27, 2026.

**PubMatic Code**

54.    PubMatic runs code on publisher websites and in ad slots that can track users and synchronize advertising identifiers.  PubMatic collects data from users visiting websites and makes that data available to advertisers.

55.    PubMatic's platform involves setting cookies and using other tracking methods to recognize users across the websites in its network.  For example, PubMatic sets a cookie called a KADUSERCOOKIE on a user's browser. PubMatic's own literature states: "We  use this cookie to uniquely identify each browser or device from which an individual user visits our partners' websites."  If the KADUSERCOOKIE is not present, PubMatic will set another one, tagging the user's browser with a unique ID value.

56.    Data taken from a website like Defendant's is then "enriched" by syncing it with the data collected by other ad tech vendors, creating a broad picture of a user's browsing for advertising purposes.

57.    Over time, as the user visits more sites with PubMatic operating, PubMatic builds a log of that user's ad viewing history and site visits (to the extent those sites use PubMatic). The result is a comprehensive user profile keyed to a unique ID. PubMatic's revenue depends on identifying users and auctioning their attention to advertisers.

58.    Plaintiff was subjected to the PubMatic code as described *supra* starting when she requested that the Website load on her device on February 27, 2026.

**X Corp.  Code**

59.    X Corp. has earned at least $1 billion each year through advertising annually in the past 5 years.  It maintains this revenue by collecting massive amounts of data about individuals navigating the internet, and identifying them.

60.    Defendant deploys the X Corp. code on the Website.  The Website is configured such that the X Corp. code starts running as the Website is starting to load on a visitor's screen.

61.     The X Corp. code initiates a sophisticated fingerprinting process that allows for the tracking of visitors without the use of traditional digital identifiers such as cookies. The X Corp. code process collects and combines multiple data points including device identifiers and configurations (such as installed fonts, screen dimensions and system settings), browser identifiers and network routing information to create a highly unique digital fingerprint.

62.     Each time a fingerprinted visitor, including Plaintiff and members of the putative class, encountered (and encounters) X Corp. code ***embedded on websites other than Defendant's***, the visitor is instantly recognized by X Corp. Consequently, X Corp.'s profile on that visitor is enhanced and updated.  The X Corp. code effectively generates surveillance trackers that enable comprehensive monitoring of visitors' online activities and creates detailed user behavioral profiles.

63.     Plaintiff was subjected to the X Corp. code as described *supra* starting when she requested that the Website load on her device on February 27, 2026.

**Troubling Implications of Third-Party Data Sharing**

64.     Companies using third-party tracking software – such as the Data Broker and X Corp. code described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them.  However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

65.     As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer

CLASS ACTION COMPLAINT

17

conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

66.    As data brokers, NextRoll, LiveRamp and PubMatic can use data they received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies. The same can be said of data they received regarding the visits of members of the putative class.

67.    A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[6]

68.    There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[7]

---

[6] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[7] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

69.    Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[8]

70.    In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[9]  No clear legal authority exists preventing the sale or dissemination of user data by data brokers to the federal government.

71.    The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[10]

72.    In early March 2026, a news website reported about the existence of an U.S. Department of Homeland Security internal document revealing that Custom

---

[8] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).

[9] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

[10] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).

CLASS ACTION COMPLAINT

19

and Border Protection "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[11]

### Data and Related Profiles of Consumers Have Economic Value

73.     The type of visitor data transmitted via the Website to Data Broker and X Corp. have economic value – as is obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the Data Broker and X Corp. code on the Website.

74.     The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and members of the putative class.  For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[12]

---

[11] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 3/16/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 3/16/20260.

[12] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).

75. As recently explained by the Law Institute:[13]

In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex

---

[13] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

CLASS ACTION COMPLAINT

21

ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

76.     There exists an established market for the type of personal data collected through the Data Broker and X Corp. code running on the Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

**The Consent Banner on the Website Defrauded (and Defrauds) Visitors Including Plaintiff**

77.     Upon landing on the Website, Plaintiff was presented with a banner stating the following:

COOKIE CONSENT

We and our partners, including Shopify, use cookies and other technologies to personalize your experience, show

CLASS ACTION COMPLAINT
22

you ads, and perform analytics, and we will not use cookies or other technologies for these purposes unless you accept them. Learn more in our <u>Privacy Policy</u>.

78.    Beneath this text appeared three options: (1) a link using the words "Manage Preferences"; (2) a box stating "Accept"; and (3) a box stating "Decline".

79.    Plaintiff clicked on the box stating "Decline."

80.    Once Plaintiff – and all visitors to the Website – who, upon encountering Defendant's consent banner as described *supra*, declined the use of "cookies and other technologies" on the Website, they were then able to browse the Website as the consent management interface disappeared from their screens.

81.    As demonstrated with respect to Plaintiff's February 27, 2026 visit to the Website in a recording known as a "HAR File," after Plaintiff declined the "cookies and other technologies," the code deployed on Defendant's Website described *supra* continued transmitting Plaintiff's personal information – i.e., information that could be reasonably linked to her and/or reasonably likely to identify her – to third parties including the Data Brokers and X Corp.  It also was collected by the Data Brokers for use in building or enhancing a profile of her for sale to other third parties.

82.    In other words, Plaintiff's exercise of her option to proceed without being subjected to third party cookies and 'other technologies' had no impact on the transmission of data to the third parties via the Website.

83.    The type of data that continued to be shared with the Data Brokers and X Corp. *after* Plaintiff declined the use of cookies and 'other technologies' was similar or identical to the data collected by the Data Brokers and X Corp. code *before* she interacted with Defendant's consent banner.  The same can be said of the data shared from visitors to the Website similarly situated to Plaintiff after they opted out of the Website's use of "cookies and other technologies."

84.   Defendant's consent banner as described herein led Plaintiff, and all Website visitors similarly situated to Plaintiff, to believe that the Website would not "use cookies and other technologies to personalize [their] experience, show [them] ads, and perform analytics" unless they "accept[ed] them" – including "cookies and other technologies" that transmitted their data to the third parties referenced in the banner as Defendant's "partners."  Plaintiff, and such visitors, therefore relied to their detriment on Defendant's representations about the dissemination of visitor data to third parties through the use of cookies and 'other technologies.'  Defendant intended for such reliance to occur because Defendant profited through the continued operation of the Data Broker and X Corp. code on the Website as to visitors who declined the use of the "cookies and other technologies."

85.   Defendant's misrepresentations and omissions about the ability of Plaintiff and other visitors to the Website similarly situated to Plaintiff to prevent or halt the use of cookies and 'other technologies' that disseminate their personal information for such uses as optimizing marketing communications with them by clicking the "Decline" button on Defendant's consent banner were known exclusively to, and actively concealed by, Defendant.  The misrepresentations and omissions were not reasonably known to Plaintiff and members of the putative class. Further, Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and putative Class members as to whether to stay on, and use, the Website. The misrepresentations and omissions were material at the time made, because, when presented with Defendant's consent banner, Plaintiff and putative Class members had the option to leave the Website rather than allow the Website to subject them to "cookies and other technologies" that disseminated their personal information to third parties.

86.   Defendant benefited and profited from its misrepresentations and omissions regarding the use of the "cookies and other technologies" because such misrepresentations and omissions, *inter alia*, permitted (and continue to permit)

Defendant to market and advertise its products to Plaintiff and putative Class members in a more profitable and cost-effective manner.

## CLASS ALLEGATIONS

87. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons who, while located in California, visited the Website and upon encountering the Website's consent banner declined Defendant's deployment of cookies or other technologies used by Defendant and "its partners" for purposes enumerated in the banner, and thereupon stayed on the Website.**

88. This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

89. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

90. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

    a. Whether Defendant's actions violate California common or statutory law, including but not limited to whether Defendant's statements in its consent banner represent misrepresentations and omissions actionable as fraud, conceit or misrepresentation;

      b. Whether Plaintiff and Class members are entitled to statutory damages;

      c. Whether Plaintiff and Class members are entitled to punitive damages;

      d. Whether Plaintiff and Class members are entitled to injunctive relief;

      e. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

      f. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

91. TYPICALITY: Plaintiff was subjected to the Data Broker and X Corp. code running on the Website when she visited the Website on February 27, 2026, even though she declined the use of "cookies and other technologies" when she encountered the Website's consent banner. As a result, her data was transmitted to the Data Brokers and X Corp., and possibly other third parties, without her consent, for fingerprinting and tracking purposes. Her claims are therefore typical of the Class.

92. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

93. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

CLASS ACTION COMPLAINT

26

## FIRST CAUSE OF ACTION

### Fraud

94.    Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

95.    Defendant fraudulently and deceptively represented to Plaintiff and Class members that (1) Plaintiff and Class members could choose to decline the use of "cookies and other technologies" for purposes including "optimizing marketing communications" and "show[ing Plaintiff and Class members Defendant's] ads on other websites"; and (2) Defendant "w[ould] not use cookies or other technologies unless [Plaintiff and Class members] accept[ed] them."

96.    The representations were false and deceptive, and omitted material facts, because after Plaintiff and the Class members declined the use of the "cookies and other technologies" on the Website, the Data Broker and X Corp. code continued to operate on the Website as to them, transmitting the personal data of Plaintiff and the Class members to the Data Brokers and X Corp. for purposes including "optimizing marketing communications" and "show[ing Plaintiff and Class members Defendant's] ads on other websites." Further, on information and belief, Defendant, through the Data Broker and X Corp. code, continued to cause cookies and/or other technologies to be stored on the devices of Plaintiff and Class members (including the browsers on the devices) that could be used for ongoing tracking of them by the Data Brokers and X Corp.

97.    Defendant's misrepresentations and omissions about these matters were known exclusively to, and actively concealed, by Defendant. They were not reasonably known to Plaintiffs and Class members at the time they were made. Defendant knew, or should have known, how its Website functioned, and how the Data Broker and X Corp. code deployed on the Website operated – including whether any changes to their operation occurred after a visitor declined the use of "cookies and other technologies" using Defendant's consent interface. Defendant

CLASS ACTION COMPLAINT

27

also knew, or should have known, whether the code in question continued to cause cookies and/or other technologies to be stored on the devices of visitors that could be used for ongoing tracking of them by Data Broker and X Corp. after such visitors opted out of the use of "cookies and other technologies."

98.    Defendant's misrepresentations and omissions about the ability of Plaintiff and the Class members to decline the use of "cookies and other technologies" were material when made because they concerned facts that were critical to the decision of Plaintiff and Class members whether to stay on and/or continue browsing the Website. Plaintiff and the Class members could have terminated their visits to the Website if they had learned that they would be subjected to "cookies and other technologies" referenced in Defendant's consent interface, causing their data that could reasonably be used to identify them to be transmitted to third parties through the Website.

99.    By making the misrepresentations and omissions, Defendant breached its duty to Plaintiff and the Class members.  Defendant also profited from its breach, because the transmission of the personal data of Plaintiff and Class members through the Website's use of "cookies and other technologies" made Defendant's marketing and advertising more efficient and effective through targeting with the assistance of third parties including the Data Brokers and X Corp.  Plaintiff believes that additional ways in which Defendant profited from the fraudulent and deceptive practices described herein will be revealed through discovery.

100.    Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment – by informing them that they could use the Website without being subjected to the Website's use of "cookies and other technologies." Operating under the mistaken belief that they had chosen to decline such use, Plaintiff and Class members allowed more of their personal information to be transmitted to third parties including the Data Brokers and X Corp., and possibly to be sold to third parties, than they would have otherwise.

101.    Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.  Such reliance was justifiable and reasonable.  There was nothing to indicate to Plaintiff or Class members that Defendant's consent interface contained misrepresentations and/or fraudulent omissions.

102.    Plaintiff and Class members were injured as a direct and proximate result of Defendant's misrepresentations and fraudulent omissions, and their reasonable and justifiable reliance thereupon. Their injuries include the loss of money and/or property.  The data of Plaintiff and Class members fraudulently and deceptively transferred to the Data Broker and X Corp. have economic value. Defendant's fraudulent and deceptive use of the "cookies and other technologies" referenced in Defendant's consent interface, resulting in the transmission and possible sale of the personal information of Plaintiff and Class members to third parties (including the Data Brokers and X Corp.) diminished the value of such information.  Further, Defendant's use of the "cookies and other technologies" under the circumstances described herein injured the right of Plaintiff and Class members to control the distribution of their personal information, and the ways in which that information has been used, and currently is being used, by third parties.

103.    Plaintiff and Class members are entitled additionally to punitive damages because Defendant's misrepresentations and omissions concerning the use of the Data Broker and X Corp. code on the Website were made in a malicious, oppressive and willful manner. These misrepresentations and omissions were made in conscious disregard of the choice selected by Plaintiff and the Class members to decline being subjected to "cookies and other technologies" on the Website that would transmit data that could reasonably be used to identify them to third parties for marketing optimization, targeted advertisements and possibly data sales.

## SECOND CAUSE OF ACTION

**Violations of California Trap and Trace Law, Cal. Penal Code § 638.51**

104. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

105. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

106. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

107. Each of the NextRoll, LiveRamp, PubMatic and X Corp. code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

108. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

109. Each of the NextRoll, LiveRamp, PubMatic and X Corp. code is designed to identify *to a* reasonably *likely degree* the source of the electronic communications between the devices of Plaintiff and Class members, on the one

hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "**sources**" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

110. Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device under §§ 638.50-51. *See, e.g., Alex & Ani, LLC*, 2026 LX 10546, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 LX 518344, at *21-22 (C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 LX 509487, at *39-42 (C.D. Cal. Dec. 4, 2025); *Garon v. Keleops USA, Inc.*, 2025 LX 383838, at *10-15 (N.D. Cal. Sep. 2, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad* Power *Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

111. Defendant did not obtain a court order before using or installing each of the NextRoll, LiveRamp, PubMatic and X Corp. code on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

112.   Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through NextRoll, LiveRamp, PubMatic and X Corp. Indeed, Plaintiff and the Class members expressly opted out of such data-sharing or data-selling through the consent interface on the Website.

113.   Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service."  Defendant is not such a provider.

114.   CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.,* 742 F. Supp. 3d at 1077-78.

115.   Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

## THIRD CAUSE OF ACTION

### Intrusion Upon Seclusion

116.   Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

117.   Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

118.   Plaintiff and Class Members maintain a reasonable expectation of privacy in the conduct of their lives, including their internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that many of our necessary daily activities be conducted online. Plaintiff and Class members are unable to conduct their lives without engaging in substantial activity on the internet. This fact means that Plaintiff's and Class Members' private lives are susceptible to observation and

recording that can be used in ways that are comprehensive and highly intrusive – including the creation of profiles capturing their attributes, habits and behavioral patterns. If Plaintiff and Class Members cannot maintain a reasonable expectation of privacy in the conducting of their daily affairs online, and in the digital transmission of their personal information, they can have no such expectation for other facets of their lives.

119. Defendant's deployment of the Data Broker and X Corp. code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed the Data Brokers and X Corp. to identify, profile and track (on an ongoing basis) Plaintiff and Class members. Use of the Data Broker and X Corp. code violates Plaintiff's and Class Members' reasonable expectation of privacy, intercepts, collects, tracks, and compiles their Internet activity and communications, and makes access to that data available for sale as well.

120. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the Data Broker and X Corp. code on the Website.

121. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

122. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

123. The intrusion described herein would be highly offensive to a reasonable person and constitutes an egregious breach of social norms. The Data Brokers, to whom the personal information of Plaintiff and Class members is transmitted by virtue of the use of the "cookies and other technologies" on the

Website engage in a dragnet-style collection and interception of individuals' online activities. Data brokers are in the business of creating comprehensive "cradle to grave" profiles on individuals that incorporates (and matches) both an individual's online activities and offline information. The electronic information gathered by data brokers like NextRoll and LiveRamp reflect highly personal aspects of individuals' lives and can be used for purposes as political or healthcare advertising – thereby intruding on aspects of individuals' lives that are considered highly personal and confidential. Moreover, Defendant and the Data Brokers involved here have violated California statutes designed to protect the privacy rights of California citizens.

124. Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are there entitled to compensatory damages, which includes monetary damages.

125. Defendant's intrusion upon the visits to the Website of Plaintiff and Class members was intentional in that it involved the deployment of software and the configuration of code and scripts on the Website. Further, it involved Defendant's deceptive use of its consent banner, inviting Plaintiff and Class members to expose themselves to surveillance and data collection they believed that they had expressly declined.

126. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the Data Broker and X Corp. code on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to decline the use of "cookies and other technologies" by Website that would transmit their data to third parties such as the Data Brokers and X Corp. for marketing and possibly other purposes. Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to decline being subjected to "cookies and other

technologies" on the Website that could result in the sharing of their personal information to third parties for marketing and possibly other purposes.

127.    Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

### FOURTH CAUSE OF ACTION

### Unjust Enrichment

128.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

129.    Defendant intentionally aimed at increasing its sales and profits, improving its marketing and advertising while making it more cost-effective, through its misrepresentations and fraudulent omissions concerning the choice of Plaintiff and Class members to decline being subjected to "cookies and other technologies" on the Website that transmitted their data to third parties.

130.    There is no legitimate business reason that justifies Defendant's use of misrepresentations and fraudulent omissions concerning the choice of Website visitors to decline being subjected to "cookies and other technologies" on the Website that transmitted their data to third parties to benefit Defendant financially and commercially.

131.    Plaintiff and Class members conferred an economic benefit on Defendant through their decision to continue using the Website after they attempted to decline being subjected to "cookies and other technologies" on the Website that transmitted their data to third parties.

132.    Defendant has been unjustly enriched by its conduct at the expense of Plaintiff and Class members.

133.    Defendant understood the economic benefit it received from its unlawful behavior with respect to Plaintiff and Class members.  Indeed, Defendant

engaged in the unlawful conduct alleged herein in order to obtain the economic benefit it received from Plaintiff and Class members – and from all other visitors to the Website.

134. It would be unjust for Defendant to retain benefits and profits it received based on the value of the personal information shared by Defendant through the use of "cookies and other technologies" with third parties including the Data Brokers and X Corp. because that data sharing achieved through the use of the "cookies and other technologies" was conducted unlawfully and wrongfully, and without the consent of Plaintiff and Class members.

135. Plaintiff and Class members are entitled to restitution of the benefits so received by Defendant. Further, they are entitled to any amounts required to place them in the position they occupied prior to Defendant's deployment of "cookies and other technologies" on the Website transmitting their data to the Data Brokers and X Corp.

## **PRAYER**

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;

2. An award of statutory damages pursuant to CIPA;

3. An award of punitive damages;

4. An award of nominal damages;

5. An order for full restitution;

6. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8. Reasonable attorneys' fees and costs; and

9.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.


DATED: March 26, 2026                    TAULER SMITH LLP


                                         By: */s/ J. Evan Shapiro*_____
                                              J. Evan Shapiro, Esq.

                                         *Attorneys for Plaintiff Chen Wang Cole*

CLASS ACTION COMPLAINT

# **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: March 26, 2026                    TAULER SMITH LLP


                                         By:  */s/ J. Evan Shapiro*_____
                                              J. Evan Shapiro, Esq.

                                         *Attorneys for Plaintiff Chen Wang Cole*